**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | NO. 1:19-cr-00009-MHC-RGV |
| | : | |
| DEANGELO COPELAND | : | |

**MAGISTRATE JUDGE'S FINAL REPORT,**
**RECOMMENDATION, AND ORDER**

Defendant DeAngelo Copeland ("Copeland") is charged in a four-count indictment with knowingly and intentionally distributing controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2. [Doc. 1].[1] Copeland has filed a motion to suppress statements, [Doc. 22], and a motion to suppress evidence, [Doc. 24], both of which the government opposes, [Doc. 41]. Copeland also has filed a motion for leave to file a motion to dismiss out of time, [Doc. 37], which the government likewise opposes.[2]   Following an evidentiary

---

[1] The listed document and page numbers in citations to the record refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

[2] The government orally opposed the motion during argument at the conclusion of the evidentiary hearing on the motions to suppress, and the Court did not require briefing of the motion.

hearing on Copeland's motions to suppress held on October 8, 2019,[3] the parties filed post-hearing briefs.  [Docs. 41, 42 & 43].  For the reasons that follow, it is **RECOMMENDED** that the pending motions, [Docs. 22, 24 & 37], be **DENIED**.

## I.  STATEMENT OF FACTS

On January 8, 2019, a federal grand jury in the Northern District of Georgia returned a four-count indictment against Copeland, charging him in Count One with knowingly and intentionally distributing heroin on or about April 10, 2018, that resulted in serious bodily injury and death from use of the heroin by W.V. [Doc. 1 ¶ 8].  In the remaining three counts of the indictment, Copeland is charged with knowingly and intentionally distributing cocaine on or about September 6, 2018, September 10, 2018, and October 11, 2018.  [Id. ¶¶ 9-11].  The indictment includes a forfeiture provision listing, among other things, a 2017 Maserati Levante, which is alleged to be property used to facilitate the commission of the offenses in the indictment and property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of the offenses in the indictment.  [Id. at 7].

---

[3] See [Doc. 40] for the transcript of the evidentiary hearing, which will be referred to hereinafter as "(Tr. at ___)."  The government submitted exhibits at the hearing, which will be referred to as "(Gov. Ex. ___)," and Copeland also submitted exhibits at the hearing, which will be referred to as "(Def. Ex. ___)."

After the indictment was returned, Copeland exchanged text messages with an undercover agent of the Drug Enforcement Administration ("DEA") on January 14, 2019, and arranged to sell him heroin for $600 the next day.  (Tr. at 5-6, 54-55, 57-58; Gov. Ex. 4).  Around 3:55 p.m. on January 15, 2019, Copeland met the undercover agent in the parking lot outside of Best Buy at the Lindbergh Plaza in Atlanta, Georgia, and after the undercover agent entered the passenger side of Copeland's vehicle, he handed $600 to Copeland, who then provided him the heroin.  (Tr. at 6, 13-14, 33-34).  Copeland was driving a Maserati that agents recognized from prior transactions on September 6, 2018, September 10, 2018, October 11, 2018, and December 10, 2018, during which Copeland had sold drugs to the undercover agent inside the vehicle.  (Tr. at 7-8, 13).  Several DEA agents waiting nearby monitored this transaction over the radio, and once it was over, the undercover agent alerted them that he had successfully purchased the heroin. (Tr. at 14, 55, 58).  Agents then observed Copeland drive the Maserati across the parking lot to an Arby's, where he exited the vehicle and entered the restaurant. (Tr. at 14-15).  After a short while, Copeland walked out of the restaurant with food and a drink, at which time he was surrounded by several agents who arrested him near his vehicle.  (Tr. at 15, 36, 39).  The agents were dressed in plainclothes, but carried firearms and wore vests identifying them as DEA agents.  (Tr. at 20, 23, 39).  They placed Copeland on the ground, handcuffed and searched him, and

discovered on his person a cell phone and the $600 from the transaction with the undercover agent.  (Tr. at 16, 39).

The DEA agents then transported Copeland to the lower deck of the parking lot in an unmarked vehicle and moved the Maserati to another area of the same lower deck.[4]  (Tr. at 16, 19).  The agents took Copeland out of the vehicle, and as his hands remained cuffed behind his back, Task Force Officer ("TFO") Jay Criger ("TFO Criger") introduced himself and explained that Copeland was under arrest. (Tr. at 4, 19).  The handcuffs were moved to the front of Copeland's body, and at approximately 4:20pm, while Copeland was standing in front of TFO Criger's vehicle with TFO Criger and two other agents, TFO Criger presented him with an Advice of Rights form, which listed the Miranda[5] rights.  (Tr. at 19-21; Gov. Ex. 1).[6]

---

[4] Agents seized the Maserati, which was the vehicle listed in the indictment's forfeiture provision, see [Doc. 1 at 7-8], and after it was moved to the lower deck, agents proceeded to conduct an inventory search of its contents in compliance with the standard DEA procedure for inventory searches and found a small bag of suspected cocaine on the driver's side floorboard, papers, keys, and a $20 bill, and the vehicle was towed from the location later that day, (Tr. at 19, 44, 57).

[5] See Miranda v. Arizona, 384 U.S. 436 (1966).

[6] The Advice of Rights form set out the Miranda rights as follows:

> You have the right to remain silent.
> Anything you say can be used against you in court.
> You have the right to talk to a lawyer for advice before we ask you any questions.
> You have the right to have a lawyer with you during the questioning.

TFO Criger read the form to Copeland while he read along.  (Tr. at 21, 50).  When he asked Copeland whether he understood his rights, Copeland responded that he did, (Tr. at 22), and when he asked whether Copeland was willing to answer questions, Copeland said that he was, (Tr. at 22, 48-49).  Both Copeland and TFO Criger signed the Advice of Rights form.[7]  (Tr. at 21; Gov. Ex. 1).  TFO Criger also presented Copeland with a form titled "Waiver of the Right to Prompt Presentment to a Magistrate," which again listed his Miranda rights, and informed him of his "right to be taken without unnecessary delay to a magistrate judge, who [would] advise [him] of the charges against [him] and provide [him] with a copy of the document that identifie[d] the charges against him[.]"  (Tr. at 25-26; Gov. Ex. 3 (emphasis omitted)).  TFO Criger asked Copeland to sign this form because the agents hoped that Copeland's prompt cooperation would allow them to locate the source of his supply and "do some sort of an enforcement action with his source . . . . within a few hours of him being taken into custody[.]"  (Tr. at 27).  Copeland signed this form after it was read to him by TFO Criger.  (Tr. at 25-26; Gov. Ex. 3).

---

> If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

(Gov. Ex. 1).

[7] Copeland also signed a consent to search form that identified the address of his apartment and the code to unlock his cellphone that TFO Criger wrote on the form. (Tr. at 24-25; Gov. Ex. 2).

Throughout the interview, TFO Criger's demeanor remained calm. (Tr. at 23). At no point during the interview did TFO Criger or the other agents yell at Copeland, threaten him, or brandish their weapons. (Tr. at 23, 26-27, 29). TFO Criger did not make any promises to Copeland, nor did he observe any other agents do so. (Tr. at 23, 26). Early on in the interview, TFO Criger asked Copeland about the $600 found in his pocket during the initial search, and Copeland explained that he won the money in a bet with a friend. (Tr. at 27-28). Because the agents had already confirmed that the $600 found on his person was the same money used by the undercover agent to purchase the heroin from Copeland, it was apparent to TFO Criger that Copeland was lying. (Tr. at 28). TFO Criger reminded Copeland that he was being arrested for "a very serious offense," and proceeded to read the arrest warrant to inform him of the specific charges against him. (Tr. at 28, 50). TFO Criger then walked approximately 15 to 17 yards away from Copeland, leaving him with the other two agents for about five to seven minutes. (Tr. at 28-29). When TFO Criger returned, the interview continued. (Tr. at 29).

Copeland did not ask to stop the questioning or request to speak to a lawyer at any point during the interview. (Tr. at 31). His answers were consistently responsive to the questions asked, and he frequently asked his own questions, including questions about the nature of his charges, but at no point did he indicate

an inability to understand what was happening. (Tr. at 31-32). Copeland's demeanor was calm throughout the interview. (Tr. at 32). Due to the cold weather, Copeland's nose was running a bit, so there were times when the agents paused the interview to assist him. (Tr. at 32, 34). The interview concluded at approximately 5:15 p.m., and Copeland left the parking deck with the agents and traveled with them to his apartment where a search was conducted. (Tr. at 30). Copeland made certain incriminating statements during this interview that he now moves to suppress, [Doc. 22], and the government opposes his motion, [Doc. 41]. [8]

---

[8] Copeland also moved to suppress evidence seized from the Maserati, [Doc. 24], but in his post-hearing brief, Copeland concedes that the search of his vehicle "was authorized as an inventory search based on the facts of the case." [Doc. 42 at 10]. He also acknowledges that the vehicle was lawfully searched pursuant to the automobile exception to the warrant requirement under current case law, but wishes to preserve his argument regarding the mobility of the vehicle "in the event that the definition of mobility changes in the future," [id. at 9], and to preserve the issue of probable cause as to the search of the vehicle, recognizing that "under current case law a finding of probable cause is met here," [id.]. Accordingly, based on Copeland's concession and the cases cited in the government's post-hearing brief, [Doc. 41 at 7-13], it is **RECOMMENDED** that Copeland's motion to suppress evidence, [Doc. 24], be **DENIED** because it is undisputed that the inventory search was conducted in accordance with standard DEA procedures for a vehicle subject to seizure and forfeiture, see Florida v. Wells, 495 U.S. 1, 4 (1990), and also, the vehicle was lawfully searched pursuant to the automobile exception since it was readily mobile and agents had probable cause to believe it contained evidence of a crime as Copeland had just sold drugs to the undercover agent inside the vehicle, as he had done on several prior occasions, and then driven it to the Arby's restaurant after completing the transaction, see United States v. Brown, 203 F. App'x 997, 999 (11th Cir. 2006) (per curiam) (unpublished).

## II.  DISCUSSION

### A.    <u>Motion to Suppress Statements, [Doc. 22]</u>

Copeland contends that the statements he made after his arrest on January 15, 2019, were obtained in violation of his <u>Miranda</u> rights.  [Docs. 22 & 42].  He claims that although he "was given the <u>Miranda</u> warnings and [] signed a form waiving his rights," the "cold temperature [] affected the validity of [his] <u>Miranda</u> waiver, as waiving his rights and providing the statement was the fastest way to bring an end to the interrogation."   [Doc. 42 at 7, 8 n.4 (citations omitted)]. Moreover, he notes that there was a five to seven minute gap in the interrogation during which he was left alone with two officers, and he asserts that, because "[t]he government did not present evidence as to whether or not [he] requested that the interrogation be stopped" or "requested an attorney," the government has not met its burden of establishing compliance with <u>Miranda</u>, as questioning would have been required to cease under those circumstances.  [<u>Id.</u> at 8].  Copeland also argues that his statements were not voluntary because the government failed to prove that the officers did not make promises inducing his confession during that time gap, and because "his will was overborne" due to "exposure to the elements," asserting that he merely "confessed so he could be moved inside, to a warmer place."  [<u>Id.</u> at 6-7].

The government responds that Copeland validly "waived his *Miranda* rights after [being] read them from a pre-printed form containing standard *Miranda* warnings," and that his waiver was not coerced, as "there is no evidence that agents yelled, threatened, or made promises to induce [him] to agree to speak without an attorney."   [Doc. 41 at 16-17 (emphasis omitted)].   Moreover, the government contends that Copeland's statements were voluntary, arguing that "standing outside in the winter for less than an hour is not inherently coercive such that subsequent statements are involuntary" and "there is no evidence in the record of any unlawful coercion following [his] arrest."   [Doc. 43 at 1].   The Court will address each of these arguments in turn.

### 1.   Waiver of Miranda Rights

The ruling in <u>Miranda</u> requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation.   <u>Garcia v. Singletary</u>, 13 F.3d 1487, 1489 (11th Cir. 1994) (citation omitted); <u>United States v. Rush</u>, 144 F. App'x 13, 14 (11th Cir. 2005) (per curiam) (unpublished) (citation omitted).   "A defendant may waive these rights, but only if 'the waiver is made voluntarily, knowingly and intelligently,'" and it is the government's burden to prove by a preponderance of the evidence that the defendant validly waived his rights.   <u>United States v. Bernal-Benitez</u>, 594 F.3d 1303, 1318 (11th Cir. 2010) (citations omitted); <u>see also</u> <u>Colorado v. Connelly</u>, 479

U.S. 157, 168 (1986) (citations omitted) ("Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence.").  There is a "two-part inquiry into whether a defendant's waiver of *Miranda* rights was voluntary, knowing, and intelligent," which involves first assessing whether "the relinquishment of the right [was] . . . voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and second, whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995) (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)). "'[V]oluntariness' in the context of a *Miranda* wavier means the same thing as 'voluntariness' in the due process context, i.e., freedom from official coercion." Miller v. Dugger, 838 F.2d 1530, 1538 (11th Cir. 1988) (citing Connelly, 479 U.S. at 169).

"If the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension, a court may properly conclude that the *Miranda* rights have been waived." Rush, 144 F. App'x at 15 (alterations, footnote, citation, and internal marks omitted); see also Moran, 475 U.S. at 421.  "[A]n express oral or written waiver of *Miranda* is strong proof of

the validity of the waiver." United States v. Graham, Criminal Action File No. 3:13–cr–11–TCB, 2014 WL 2922388, at *14 (N.D. Ga. June 27, 2014) (citation omitted). However, even after waiving the Miranda rights, "[i]f a defendant unambiguously requests [] counsel or to remain silent, police must cease interrogation." Hall v. Thomas, 611 F.3d 1259, 1285 (11th Cir. 2010) (citation omitted); see also Berghuis v. Thompkins, 560 U.S. 370, 381 (2010) (citation and internal marks omitted) (explaining that a suspect has the "right to cut off questioning" when he unambiguously invokes his right to remain silent); Davis v. United States, 512 U.S. 452, 458 (1994) (citation omitted) ("[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation."); Miller, 838 F.2d at 1537 (citing Edwards v. Arizona, 451 U.S. 477 (1981)) (explaining that police must cease all questioning once the suspect invokes the right to an attorney).

It is undisputed that Copeland was subjected to a custodial interrogation on January 15, 2019, triggering the requirements of Miranda. See [Doc. 41 at 14-19; Doc. 42 at 5-8; Doc. 43 at 2-5]. Copeland does not contest the content of the Advice of Rights form and concedes that he "was given the Miranda warnings and [] signed a form waiving his rights," [Doc. 42 at 7 (citations omitted)], but argues that his waiver was not voluntary due to the cold weather, which motivated him to

11

waive his rights so that the interrogation could end more quickly, [id. at 8 n.4]. The government responds by pointing out that unlawful coercion is necessary to a finding that the waiver was involuntary, and argues that interrogating Copeland outside in the winter for a short time was not nearly coercive enough to render his waiver involuntary.  [Doc. 43 at 1].  The Court agrees.

Copeland "points to no evidence of threat or coercion leading to his statement[s], and the evidence indicates that [he] understood both his right to remain silent and the consequences of waiving that right."  United States v. Robinson, Criminal Action No. 1:07–CR–0138–BBM–CCH, 2007 WL 9676863, at *5 (N.D. Ga. Nov. 19, 2007), adopted by 2008 WL 11383732, at *4 (N.D. Ga. Feb. 22, 2008) (citation omitted); see also (Tr. at 22, 48-49; Gov. Ex. 1).  Although Copeland relies on the cold weather at the time of the interview to support his contention that his waiver was not voluntary, the record contains no evidence that he ever complained about being cold or requested that the interview be moved to a warmer location.  See generally [Doc. 40]; see also United States v. Crumpton, 824 F.3d 593, 607-08 (6th Cir. 2016) (citation omitted) (finding that the defendant was not coerced into waiving his Miranda rights because "the fact that [he] was put outside in the cold certainly plays into the totality-of-the-circumstances analysis, but it is a single factor that is outweighed by other factors," including that he was advised of his rights and given a waiver form that he then signed, as well as the

brief nature of the interview); <u>Crittenden v. Calderon</u>, No. CIV S-97-0602 FCD GGH P, No. CIV S-95-1957 FCD GGH P, 2003 WL 27382026, at *33 (E.D. Cal. Feb. 27, 2003), adopted by 2005 WL 8156679, at *24 (E.D. Cal. Feb. 23, 2005) (explaining that a cold interview room would not, on its own, form the basis for a finding of coercion, given that "Petitioner was not purposefully placed in a room close to the freezing temperature in which he would experience pain in order to obtain answers occasioned by a desire to get someplace warm").  Moreover, as the government points out, although Copeland insists that he only waived his rights so that the interview would end more quickly, "[r]efusing to speak with agents would have ended the interview," but instead, "Copeland acknowledged his choice to continue the interview rather than promptly appear in court on the pending charges."  [Doc. 43 at 2 n.1 (citing (Gov. Ex. 3))].

Copeland also argues that "the government has failed to introduce evidence as to what transpired during the five to seven minute gap when [he] was left alone with two officers," including "whether or not [he] requested that the interrogation be stopped" and "whether or not [he] requested an attorney."  [Doc. 42 at 8].  However, Copeland's argument "calls on the Court to speculate as to what *could* have happened at the scene of his [interrogation.]"  <u>United States v. Orozco-Cuellar</u>, No. CR407-037, 2007 WL 2904165, at *3 (S.D. Ga. Oct. 2, 2007), adopted by 2007 WL 3069323, at *1 (S.D. Ga. Oct. 17, 2007).  Copeland is correct that the

government has the burden of proving waiver by a preponderance of the evidence, Connelly, 479 U.S. at 168 (citations omitted); United States v. Padilla, No. 04-60001-CR-COOKE, 2006 WL 3678567, at *12 (S.D. Fla. Nov. 17, 2006), aff'd, 657 F.3d 1085 (11th Cir. 2011) (citations omitted); see also [Doc. 42 at 8], but the government has met this burden by presenting, among other evidence, TFO Criger's sworn testimony that at no point during the interview did Copeland invoke his Miranda rights, see (Tr. at 31), and that even when TFO Criger briefly stepped away from the interview, he was able to see Copeland from his vantage point, (Tr. at 29), and TFO Criger testified that, although he and other agents had weapons, no weapon was brandished at Copeland during the Miranda waiver, and he did not observe anyone yell at or threaten Copeland or make him any promises, (Tr. at 23). Thus, there is no indication in the record before the Court that Copeland was coerced or invoked his rights at any point after signing the waivers, even during the five to seven minute time gap that TFO Criger stepped away, see generally [Doc. 40]. Moreover, a defendant must unambiguously invoke the right to counsel or the right to remain silent in order to trigger the requirement that questioning cease, Thompkins, 560 U.S. at 381 (explaining that "an accused who wants to invoke his . . . right to remain silent [must] do so unambiguously"); Davis, 512 U.S. at 459 (citation omitted) ("[T]he suspect must unambiguously request counsel. . . . If the statement fails to meet the requisite level of clarity, *Edwards* does not require that

14

the officers stop questioning the suspect."); Denapoli v. Merritt, No. 8:04-cv-2340-T-23TBM, 2008 WL 1776686, at *3 (M.D. Fla. Apr. 16, 2008) (citations omitted), and Copeland points to no evidence that would satisfy this requirement.  Accordingly, "the facts are undisputed, there is no question of [TFO Criger's] credibility, and [Copeland] requests that inferences be drawn not from established facts, but from utter speculation."   United States v. Oroczo-Cuellar, No. CR407-037, 2007 WL 2904165, at *3 (S.D. Ga. Oct. 2, 2007), adopted by 2007 WL 3069323, at *1 (S.D. Ga. Oct. 17, 2007).

Considering the totality of the circumstances, including that Copeland was presented with an Advice of Rights form, which was read to him and which he had an opportunity to read himself; that he signed the Advice of Rights form, along with an additional form that also listed his Miranda rights; that he orally indicated that he was willing to speak with the agents without an attorney present; that TFO Criger never observed him invoking his rights; that TFO Criger's demeanor was calm throughout the duration of the questioning; and that there is no indication that any agents ever promised him anything or threatened him or brandished their weapons during the interview, (Tr. at 19-23, 25-26, 31, 48-50; Gov. Exs. 1-3), the Court finds that Copeland knowingly, intelligently, and voluntarily waived his rights and that the government has satisfied its burden of establishing compliance with Miranda.  Thus, "[a]s there is no evidence that [Copeland's]

15

*Miranda* waiver[] [was] involuntary or that he was coerced into continuing to talk with [TFO] [Criger]," Robinson, 2007 WL 9676863, at *5, the Court finds that there has been no Miranda violation.

### 2.   Voluntariness of Statements

Although Copeland's statements were not taken in violation of Miranda, "the [C]ourt still must determine that any confessions or incriminatory statements made by [Copeland] were voluntary in order to admit them at trial." United States v. Lazarus, 552 F. App'x 892, 895 (11th Cir. 2014) (per curiam) (unpublished) (citing Bernal–Benitez, 594 F.3d at 1317–18).   Whether a statement was voluntarily given must be examined in light of the totality of the circumstances.   United States v. Shepherd, Criminal Case No. 1:11–cr–00058–ODE–RGV–1, 2011 WL 4443440, at *7 (N.D. Ga. Aug. 23, 2011), adopted by 2011 WL 4443435, at *1 (N.D. Ga. Sept. 21, 2011) (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Hubbard v. Haley, 317 F.3d 1245, 1252 (11th Cir. 2003)).   "This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of 'an essentially free and unconstrained choice.'"   United States v. Villaverde-Leyva, Criminal Action File No. 1:10-CR-035-RWS/AJB, 2010 WL 5579825, at *11 (N.D. Ga. Dec. 9, 2010), adopted by 2011 WL 121932, at *1 (N.D. Ga. Jan. 14, 2011) (citation omitted).   "Among the factors [the Court] must consider are the defendant's intelligence, the length of his detention, the nature of the

16

interrogation, the use of any physical force against him, or the use of any promises or inducements by police." Hubbard, 317 F.3d at 1253 (citations omitted).

The focus of the voluntariness inquiry is whether Copeland was coerced by the government into making the statement, so "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran, 475 U.S. at 421; see also United States v. Cordova, 829 F. Supp. 2d 1342, 1353 (N.D. Ga. 2011), adopted at 1345 (citation omitted). Thus, "[t]hose cases where courts have found confessions to be involuntary 'have contained a substantial element of coercive police conduct.'" United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007), adopted at *1 (citation omitted); see also Connelly, 479 U.S. at 167 ("[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'"); Demarest v. Sec'y, Dep't of Corr., Case No. 8:13-cv-75-T-36TBM, 2016 WL 951913, at *6 (M.D. Fla. Mar. 14, 2016) (citation omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." United States v. Jones, 32 F.3d 1512, 1517 (11th Cir. 1994) (per curiam) (citation and internal marks omitted); see also Martin v. Wainwright, 770 F.2d 918, 926 (11th Cir. 1985), modified in unrelated part by, 781

F.2d 185 (11th Cir. 1986) (per curiam) (alteration in original) (citation and internal marks omitted) (noting that the test for determining voluntariness of a confession and whether coercion was present is whether the defendant's "will [was] overborne and his capacity for self-determination critically impaired").

Copeland again cites his exposure to the cold January weather, asserting that "his will was overborne," rendering his statements involuntary. [Doc. 42 at 7]. "A confession is involuntary if the suspect's 'will was overborne in such a way as to render his confession the product of coercion.'" Demarest, 2016 WL 951913, at *6 (quoting Arizona v. Fulminante, 499 U.S. 279, 288 (1991)); see also United States v. Pinder, CRIMINAL ACTION FILE NO. 1:08-CR-421-03-MHS/AJB, 2009 WL 10670633, at *30 (N.D. Ga. Dec. 23, 2009), adopted by 2010 WL 11507903, at *14 (N.D. Ga. Mar. 6, 2010), aff'd, 437 F. App'x 816 (11th Cir. 2011) (per curiam) (unpublished) (citation and internal marks omitted) ("Determining if a confession is voluntary requires examining whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."). As previously noted, the Court must consider the totality of the circumstances, including the location of the interview, to determine whether Copeland's statements were voluntary. Pinder, 2009 WL 10670633, at *30 (citations omitted); see also Bernal-Benitez, 594 F.3d at 1319 (citation omitted) ("[The Court] consider[s] the totality of the circumstances, including the details of the interrogation and the defendant's characteristics, when

18

deciding whether a confession was voluntary."). Although the cold weather caused Copeland's nose to run at times during the interview, the agents promptly assisted him, and he "did not appear to be [otherwise] affected by the cold, nor did he ask for relief from it." See Pinder, 2009 WL 10670633, at *31. Moreover, as the government points out, the evidence does not show that the agents "select[ed] the interview location to elicit incriminating statements or exploit Copeland's runny nose," but rather, the record reflects that "they questioned Copeland outside a police vehicle in the lower parking deck minutes after he sold to an undercover [agent] because that location provided them privacy and the best opportunity to quickly identify and target his source of supply." [Doc. 43 at 3 (citation omitted)]; see also Pinder, 2009 WL 10670633, at *31 (finding that the circumstances did not show that defendant's statements were involuntary because "while the room was cold, there [was] no indication that the temperature was made cold in order to induce a confession"); (Tr. at 27 (showing that the agents' plan was to get Copeland's cooperation quickly so they could identify his source of supply and further their investigation with some sort of enforcement action "within a few hours of [Copeland] being taken into custody")).

Copeland also argues that because the government failed to introduce evidence as to what transpired during a five to seven-minute gap in the interview, it is possible that the agents made promises to Copeland to induce his confession.

[Doc. 42 at 6].  Under certain circumstances, promises made by law enforcement officers can render a statement involuntary.  E.g., United States v. Lall, 607 F.3d 1277, 1283 (11th Cir. 2010) (finding that the detective's promise that he would not pursue charges against the defendant made his subsequent statements involuntary because it contradicted the previously given Miranda warnings). Moreover, coercion and deception can trigger suppression, including "lies about a defendant's legal rights (i.e., 'you must answer our questions'), false promises (i.e., 'whatever you say will be just between us'), or threats (i.e., 'if you don't talk, you won't see your family for a very long time')."  United States v. La Forgia, Criminal No. 12–0057–WS–C, 2012 WL 1869035, at *4 (S.D. Ala. May 22, 2012) (footnote and citation omitted).  However, Copeland has not pointed to any evidence in the record as opposed to speculation that any coercion, whether by promises or threats, may have been made when TFO Criger stepped away momentarily during the interview, and the government, by contrast, has presented evidence that no promises or threats were made to coerce Copeland's statements.  See (Tr. at 23, 26); see also United States v. Mercer, 541 F.3d 1070, 1075 (11th Cir. 2008) (per curiam) (footnote omitted) ("[N]othing in the record evidences that anyone made promises to Defendant, direct or implied, in exchange for his statements."); La Forgia, 2012 WL 1869035, at *4 ("Simply put, there is no

evidence of the kinds of affirmative misrepresentations that might render [defendant's] statements involuntary and require their suppression.").

"Considering the totality of the circumstances as established by the evidence adduced at the evidentiary hearing, the Court finds that the government has demonstrated by a preponderance of the evidence that [Copeland's] statements were entirely voluntary."  United States v. Lynn, 547 F. Supp. 2d 1307, 1311 (S.D. Ga. 2008), adopted at 1308 (citations omitted).  The interview, which lasted less than one hour, see (Tr. at 30 (showing that the interview had concluded by 5:15 p.m.); Gov. Ex. 1 (showing that the Advice of Rights form, presented to Copeland at the start of the interview, was signed at 4:20 p.m.)), was not unreasonably long, see Shriner v. Wainwright, 715 F.2d 1452, 1455 (11th Cir. 1983) (concluding that statements made during a five hour interrogation were not involuntary); Pinder, 2009 WL 10670633, at *31 (citation omitted) (finding that two hours and twenty minutes of interrogation was not coercive), and TFO Criger testified that the agents, who were dressed in plainclothes and never yelled or brandished weapons during the interview, did not use physical force against Copeland, see Moran, 475 U.S. at 421 (citation omitted) ("[T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."); Miller, 838 F.2d at 1537 (finding that "there was no official overreaching that could have rendered [defendant's] statement involuntary" under the totality of the

circumstances, including that "[t]he transcript [did] not suggest, nor d[id] [defendant] allege, that the police either applied physical force or threatened to do so"), nor is there any evidence that Copeland's statements were induced by any promises made by the agents, see United States v. Santos-Urrea, CASE NO.: 99-432-CR-SEITZ, 1999 WL 35805090, at *2 (S.D. Fla. Oct. 8, 1999), adopted by 1999 WL 35805091, at *1 (S.D. Fla. Nov. 10, 1999) (finding that defendant's statements were voluntary, noting that his "particular contentions concerning threats and promises of leniency by the agents [were] not supported by the evidence").  Thus, the statements Copeland made on January 15, 2019, were voluntary and are not due to be suppressed.  Therefore, it is **RECOMMENDED** that Copeland's motion to suppress statements, [Doc. 22], be **DENIED**.

**B.    Motion for Leave to File Out of Time Motion to Dismiss, [Doc. 37]**

After the time for filing pretrial motions had passed, Copeland filed a motion for leave to file a motion to dismiss out of time, arguing that a recently decided Eleventh Circuit case, United States v. Feldman, 936 F.3d 1288 (11th Cir. 2019), provides good cause to grant him leave to file the motion because the case and the arguments he has crafted therefrom were not reasonably available by the filing deadline set by the Court.  [Doc. 37 at 2-3].  In his proposed motion to dismiss, Copeland argues that Count One fails to state an offense under the enhanced penalty provision of 21 U.S.C. § 841(b)(1)(C) because the victim "died

following an extended binge that included using heroin allegedly purchased from the defendant—and at least one other controlled substance provided by a person who has not been charged," and the indictment failed to assert that the victim would not have died "but for" the heroin. [Doc. 37-2 at 3, 6 (internal marks omitted)]. Therefore, "Copeland asks that the penalty provision contained in Count One of his indictment be dismissed under Fed. R. Crim. P. 12(b) for failure to state an offense," or, "[i]n the alternative, . . . that the reference to the death and serious bodily injury of [W.V.] be stricken." Id. at 6]. At the evidentiary hearing on his motions to suppress, the government opposed Copeland's motion, arguing that his motion to dismiss does not rely on Feldman, but rather on a 2014 Supreme Court case, Burrage v. United States, 571 U.S. 204 (2014), which was decided long before the deadline for filing pretrial motions in this case. (Tr. at 61-62). The government added that Feldman did not change the law, but rather was "entirely based on the 2014 Supreme Court case," and thus Copeland has failed to identify good cause for filing his motion out of time. (Tr. at 62-63). Moreover, the government argued that the indictment sufficiently states an offense because it tracks the language of the statutory provisions that Copeland is charged with violating, and thus Copeland's motion would fail on its merits. (Tr. at 63-64). The Court will address the timeliness of Copeland's motion, as well as its merits, in turn.

### 1.    Timeliness

"An objection that an indictment is defective, including the defense that the indictment fails to state an offense, must be raised by pretrial motion 'if the basis for the motion is then reasonably available.'"   United States v. Nursey, CASE NO. 2:15–CR–112–WKW, 2015 WL 7074570, at *2 (M.D. Ala. Aug. 7, 2015), aff'd in part, 696 F. App'x 983 (11th Cir. 2017) (per curiam) (unpublished) (footnote omitted) (quoting Fed. R. Crim. P. 12(b)(3)(B)); see also United States v. Hernandez, Criminal Action No. 2:14cr647-MHT, 2015 WL 4602866, at *2 (M.D. Ala. July 29, 2015) (citation omitted); Fed. R. Crim. P. 12(b)(3)(B)(v).  Pursuant to Federal Rule of Criminal Procedure 12(c), "the court may . . . set a deadline for the parties to make pretrial motions," and "[i]f a party does not meet the deadline for making a Rule 12(b)(3) motion, the motion is untimely."  Fed. R. Crim. P. 12(c)(1), (3); see also LCrR 12.1(B), NDGa. ("Motions filed in criminal proceedings shall be filed with the clerk within fourteen (14) days after arraignment.  A magistrate judge may for good cause extend the filing time for one fourteen (14)-day period.").  "A defendant who fails to file his motion within the deadlines set by the court waives his right to assert this motion," but "this waiver may be excused for good cause."  United States v. Atkins, 702 F. App'x 890, 894 (11th Cir. 2017) (per curiam) (unpublished) (alterations, citations, and internal marks omitted); see also United States v. Petite, CRIMINAL NO. 16-00161-CG-B, 2017 WL 1352223, at *1 (S.D. Ala.

24

Apr. 7, 2017) (citation and internal marks omitted) ("Good cause is a flexible standard that requires consideration of all interests in the particular case."). However, "[a] defendant does not have good cause warranting relief from waiver when he had all the information necessary to bring a 12(b) motion before the date set for pretrial motions." United States v. Searcy, 278 F. App'x 979, 981 (11th Cir. 2008) (per curiam) (unpublished) (citation omitted).

On January 17, 2019, the Court ordered that the parties file pretrial motions within fourteen days after Copeland's arraignment. [Doc. 12 at 13]. Copeland subsequently filed a motion for extension of time to file pretrial motions, [Doc. 13], which the Court granted, [Doc. 16]. He then filed two more motions for extension of time, [Docs. 18 & 20], and the Court extended the filing deadline until May 13, 2019, [Doc. 21]. Before this deadline had passed, Copeland filed his motions to suppress evidence and statements on May 10, 2019. See [Docs. 22 & 24]. Then, on September 27, 2019, Copeland filed the instant motion, seeking leave to file a motion to dismiss for failure to state an offense, out of time, arguing that his motion depends on an Eleventh Circuit case, Feldman, which was decided on August 30, 2019, several months after the deadline for filing pretrial motions. [Doc. 37 at 2-3].

Although Copeland asserts that he could not have filed his motion by the filing deadline because it is dependent upon Feldman, which had not yet been

decided, a review of Copeland's motion to dismiss reveals that his arguments rely on the Supreme Court's ruling in <u>Burrage</u>, which had been decided several years before the filing deadline.[9]   Copeland asserts that, pursuant to <u>Burrage</u>, a defendant cannot be convicted under the enhanced penalty provision of § 841(b)(1)(C) unless use of the drug distributed by the defendant was the but for cause of the victim's death or injury, and that because the indictment fails to specifically charge that Copeland's heroin distribution was the but for cause of W.V.'s death, the indictment fails to state an offense.  [Doc. 37-2 at 5].  He adds that in <u>Feldman</u>, the Eleventh Circuit erroneously extended <u>Burrage</u>'s holding to find that, under similar circumstances, "when a person ingests two substances, which if taken alone would not result in death, but when taken together do," this is sufficient to establish but for causation to support a conviction under § 841(b)(1)(C).  [<u>Id.</u> at 6].  Copeland argues that "<u>Feldman</u> was wrongfully decided" and he "raises the issue to preserve it for future review."   [<u>Id.</u>].   Thus, the government correctly contends that Copeland's motion to dismiss is premised on the ruling in <u>Burrage</u>, and the recent decision in <u>Feldman</u> concerning the sufficiency of the evidence to support a conviction under § 841(b)(1)(C) does not provide a new basis for dismissing Count One of the indictment.

---

[9] The merits of Copeland's motion to dismiss will be discussed in greater detail hereinafter.

"A defendant does not have good cause warranting relief from waiver when he had all the information necessary to bring a 12(b) motion before the date set for pretrial motions." Searcy, 278 F. App'x at 981 (citation omitted). "[T]he contents of [Copeland's] motion show no good cause exists," as his analysis centers on a case that was decided over five years ago, and "[t]herefore, it is not newly decided precedent [that he] attempts to rely upon." Petite, 2017 WL 1352223, at *1 (citation omitted). Accordingly, because Copeland has failed to show that the basis for his motion to dismiss was not reasonably available before the filing deadline, see Fed. R. Crim. P. 12(b)(3)(B)(v), he has failed to identify good cause for filing his motion to dismiss after the deadline, and his motion for leave to file out of time is due to be denied, see Nursey, 2015 WL 7074570, at *2 (citation omitted) (declining to consider defendant's motion to dismiss as untimely because "[d]efendant's arguments relating to the indictment's alleged failure to state an offense could have been timely raised had counsel considered the indictment" and the statutory construction and legislative history of 18 U.S.C. § 1513(e) "at the time of [d]efendant's indictment and arraignment," and "counsel's delay or inadvertence [did] not constitute 'good cause'"); United States v. Mwangi, Criminal File No. 1:09-CR-107-TWT, 2010 WL 690136, at *3-4 (N.D. Ga. Feb. 18, 2010), adopted at *1 (denying defendant's motion for leave to file various motions because "[a] review of the underlying motions for which [he sought] to file indicate[d] that the facts

and information upon which these motions [were] based were known to [him] well before he filed the motions").[10]

### 2.  Merits

Even if Copeland had shown good cause to file his untimely motion to dismiss the indictment, his arguments for dismissal fail on the merits.  "The sufficiency of a criminal indictment is determined from its face."  United States v. Critzer, 951 F.2d 306, 307 (11th Cir. 1992) (per curiam); see also United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (citation omitted) ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes.").  "A district court may not dismiss an indictment based on a determination of facts that should have been developed at trial."  United States v. Baxter, 579 F. App'x 703, 705 (11th Cir. 2014) (per curiam) (unpublished) (citations omitted) ("[A] district court cannot properly dismiss an indictment on the ground that there is insufficient evidence to support the allegations.").

An indictment is valid "if it (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against

---

[10] Although Copeland's motion to dismiss is due to be denied as untimely, the Court will nonetheless proceed to consider its merits.

double jeopardy for any subsequent prosecution for the same offense." United States v. Dabbs, 134 F.3d 1071, 1079 (11th Cir. 1998) (citations omitted); United States v. Steele, 147 F.3d 1316, 1320 (11th Cir. 1998) (citation omitted); United States v. Courtright, No. 8:09–cr–443–T–24 AEP, 2010 WL 1645124, at *2 (M.D. Fla. Apr. 22, 2010) (citation omitted). "Constitutional requirements are fulfilled 'by an indictment that tracks the wording of the statute, as long as the language sets forth the essential elements of the crime.'" Critzer, 951 F.2d at 308 (quoting United States v. Yonn, 702 F.2d 1342, 1348 (11th Cir. 1983)); see also Baxter, 579 F. App'x at 706; United States v. Bobo, 344 F.3d 1076, 1083 (11th Cir. 2003) (citations and internal marks omitted) ("[I]f the indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."). Furthermore, "[i]f an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge." United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998) (footnote and citation omitted).

Section 841(a) states that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]"   21 U.S.C. §

841(a)(1).   The statute also contains an enhanced penalty provision, which

provides:

> In the case of a controlled substance in Schedule 1 . . . , such person
> shall be sentenced to a term of imprisonment of not more than 20
> years and if death or serious bodily injury results from the use of such
> substance shall be sentenced to a term of imprisonment of not less
> than twenty years or more than life, a fine not to exceed the greater of
> that authorized in accordance with the provisions of Title 18 or
> $1,000,000 if the defendant is an individual or $5,000,000 if the
> defendant is other than an individual, or both.

21 U.S.C. § 841(b)(1)(C).   Copeland has been charged with violating both of these

provisions.   Specifically, Count One of the indictment charges:

> On or about April 10, 2018, in the Northern District of Georgia,
> [Copeland] . . . did knowingly and intentionally distribute a
> controlled substance, said act involving a mixture and substance
> containing a detectable amount of heroin, a Schedule 1 controlled
> substance, and serious bodily injury and death resulted from the use
> of the heroin by W.V., all in violation of Title 21, United States Code,
> Sections 841(a)(1) and 841(b)(1)(C), and Title 18, United States Code,
> Section 2.

[Doc. 1 at 5 ¶ 8].  This charge is based on Copeland's alleged sale of heroin to W.V.,

who, according to the autopsy report, died from an "'acute intoxication by the

combined effects of ethanol, alprazolam, and heroin.'"  [Id. at 4-5 ¶ 5].

Copeland relies on Burrage to support his contention that Count One of the

indictment "does not allege the facts necessary to state an offense."  [Doc. 37-2 at

5].  He argues that Burrage held that "defendants cannot be convicted under the

penalty provision of § 841(b)(1)(C) under the circumstances present here, that is,

cases involving a drug cocktail when there is no allegation that the use of heroin was the 'but for' cause of death or serious bodily injury," and thus such language must have been specifically included in the indictment for it to properly state an offense.  [Id. at 6].  However, contrary to Copeland's contentions, Burrage did not address the sufficiency of an indictment, but rather engaged in an analysis of the sufficiency of the evidence to impose the penalty enhancement under § 841(b)(1)(C).

In Burrage, the Supreme Court interpreted the phrase, "death results from," in § 841(b)(1)(C), and held that when "use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." Burrage, 571 U.S. at 218-19.  Thus, "[c]ontrary to [Copeland's] argument, Burrage does not require that an indictment contain language instructing the jury on but-for causation or suggest that an indictment lacking such an instruction is invalid." United States v. Atkinson, CASE NO.: 2:18-cr-47, 2019 WL 1398006, at *4 (S.D. Ga. Mar. 27, 2019), adopted by 2019 WL 1757116, at *2 (S.D. Ga. Apr. 19, 2019).  Instead, the Court merely "held that a jury charge that expressly instructs the jury on a lower standard of causation (i.e., 'contributing cause') is erroneous but did not go so far as to conclude that a jury charge *must* include express instructions on but-

for causation" and "the Court . . . said nothing about the sufficiency of a jury charge that contained only the statutory 'results from' language, without more." Id. Indeed, "Burrage only addressed the propriety of a jury instruction; it did not discuss what language might be required in an indictment." Id. (citation omitted). Copeland is essentially asking the Court to review the sufficiency of the evidence to support the indictment, which is not permitted when ruling on a motion to dismiss the indictment. See United States v. Medina, Criminal Action No. 2:14–CR–37–RWS–JCF, 2015 WL 3397950, at *2 (N.D. Ga. May 26, 2015), adopted at *1 (quoting Baxter, 579 F. App'x at 706) ("In determining whether an indictment should be dismissed for failure to allege an offense, [] 'a court ruling on a motion to dismiss may not look beyond the four corners of the indictment, nor may it properly dismiss an indictment for insufficient evidence.'").

Count One of the indictment tracks the language of § 841(b)(1)(C), stating that "serious bodily injury and death resulted from the use of the heroin." Compare [Doc. 1 at 5 ¶ 8], with 21 U.S.C. § 841(b)(1)(C). Because an "indictment is sufficient if it charges in the language of the statute," Critzer, 951 F.2d at 307, the Court finds that Count One of the indictment sufficiently states an offense, see Atkinson, 2019 WL 1398006, at *4 (concluding that "an indictment that charges the 'results from' statutory language (or some close variant of it) suffices to seek a § 841(b)(1)(C) penalty enhancement, and but-for causation need not be expressly

alleged"). Accordingly, even if Copeland's motion to dismiss had been timely filed, it would be due to be denied on its merits. Therefore, it is **RECOMMENDED** that Copeland's motion for leave to file out of time, [Doc. 37], be **DENIED**.

### III. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Copeland's motion to suppress evidence, [Doc. 24], motion to suppress statements, [Doc. 22], and motion for leave to file a motion to dismiss out of time, [Doc. 37], be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 27th day of January, 2020.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE